[Cite as *In re K.C.*, 2014-Ohio-3429.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


IN THE MATTER OF:                          :

      K.C.                                     :          CASE NOS.  CA2013-12-119
                                                             CA2013-12-120

                                                :          O P I N I O N
                                                             8/7/2014

                                                :

                                                :


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 11-D00645


David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children's Services

Michael K. Allen & Associates, Mary K. Martin, 5181 Natorp Blvd., Suite 210, Mason, Ohio 45040, for appellant, B.C.

Andrew J. Brenner, 7588 Central Parke Blvd., Suite 133, Mason, Ohio 45040, for CASA

John C. Kaspar, 130 Mulberry Street, Lebanon, Ohio 45036, for minor child

Jennifer C., 3064 Lytle Road, Waynesville, Ohio 45068, appellant, pro se


     **HENDRICKSON, P.J.**

     **{¶ 1}** Appellants, the biological father and paternal grandmother of K.C., appeal a decision of the Warren County Juvenile Court granting permanent custody of the child to a children services agency and denying the grandmother's motion for legal custody.

{¶ 2} On May 17, 2011, Warren County Children Services filed a complaint alleging K.C. was a neglected and abused child. The complaint indicated that the agency received a referral that the child had a handprint mark on his face. The child's father was arrested and charged with child endangerment for the incident. The complaint also alleged that the father had a previous child endangerment charge for an incident in which K.C. was discovered wandering down the street without clothes on while the father was in bed sleeping. The complaint further alleged that the agency had previous contact with the family based on referrals of an unsanitary home. At the time, K.C., his mother and father were all living in his paternal grandmother's house.

{¶ 3} Emergency shelter care was granted to the agency and K.C. was placed in a foster home. A case plan was prepared for reunification of the family. The trial court adjudicated K.C. a neglected and abused child on July 15, 2011 and in August, temporary custody was granted to the agency.

{¶ 4} The father made progress on the case plan aimed towards reunification. However, problems arose regarding the parental relationship and the agency received additional allegations of physical abuse. On October 19, 2012, the agency moved for permanent custody of the child. The paternal grandmother filed a motion for legal custody of the child on December 11, 2012.

{¶ 5} A hearing on the agency's motion for permanent custody and the grandmother's motion for legal custody began on February 25, 2013. The trial was held over 11 days and concluded on August 28, 2013.

{¶ 6} At the hearing, K.C.'s preschool teacher and the preschool director testified regarding their involvement with the family prior to the child's removal from the home. The teacher and director both testified that they had concerns because K.C. came to school dirty and unkempt and had behavior problems. The director indicated that although she has been

in education for 35 years, what she saw was "shocking." She described K.C. as a "lost child" or a "feral child" who had no attention span. She observed the child eating food out of the garbage and licking water out of paint jars like a dog. K.C. had a rash from his back to mid-thigh and his body and clothes were caked in feces and reeked of urine to the point that other children were isolating him because of the smell.

{¶ 7} The preschool teacher indicated the same concerns, indicating that when K.C. first came into the classroom, it was like letting a wild animal out of a cage. The preschool received permission from the family to bathe K.C. at school and bought clothes and underwear for him. The teacher set aside some snacks to give K.C. when he came into the classroom each day. Both the teacher and director described the progress that K.C. made during the school year, both socially and academically. The director indicated that the progress she observed indicated that it was not that K.C. was unable to do things, but instead that he had not been environmentally exposed to those things. She indicated that he was a smart child, but did not have the environment to grow in. She stated that some of his issues may be developmental, but the majority of issues were environmental, including not enough structure and stimuli to engage and learn.

{¶ 8} Two agency caseworkers testified at the hearing. The first caseworker testified that the agency had a history of multiple calls regarding the family, including calls regarding broken bones and cuts and the condition of the child. She indicated the referrals alleged that K.C. was dirty, smelled of urine and had feces on his legs. The agency investigated and found the home in "deplorable" condition. An investigation found animal feces on the carpet and floor, and the home was cluttered and had other safety concerns. The agency received another referral in April 2011 reporting that K.C. was wandering down the street, without clothes on, pulling a wagon. When police responded, they found the father asleep in the house and he was charged with child endangerment. In May 2011, the agency received a

referral that K.C. had a handprint on his face and an investigation revealed that the father had slapped the child and left a mark on his face. The father was charged with child endangerment a second time and the agency filed a complaint alleging the child was abused and neglected.

{¶ 9} The agency prepared a case plan with reunification as the goal. The mother and father were required to complete parenting classes and a mental health assessment. The child's mother was sporadic in her visits, did not complete her case plan, and her mental health was still a concern, as she had indicated she had thoughts of harming the child. During conversations with the agency, the mother indicated she was not interested in reunification, but still wanted to visit with her son.

{¶ 10} The father completed parenting classes. He also completed a mental health assessment. The caseworker indicated that there were problems with visitations between K.C. and his parents. She testified that the child often did not interact or acknowledge the parents at visits and would spit, kick and throw things, and the parents were unable to control him. The caseworker testified that after completing parenting classes, the father would attempt to redirect K.C.'s behavior, but was not successful and she saw no improvement in the father's parenting skills. The agency held visits at the agency visitation center and also at the foster mother's home in an effort to improve the interaction between K.C. and his parents. The foster mother would model parenting behavior for the parents.

{¶ 11} After removal from the home, K.C. completed an autism evaluation, but was not diagnosed with the disorder. However, he was diagnosed with attention deficit hyperactivity disorder (ADHD) and began taking medication for the condition.

{¶ 12} The caseworker indicated that by spring 2012, the condition of the home was greatly improved. In March 2012, the agency felt the case was progressing and began to allow two-hour visits supervised by the grandmother, followed by unsupervised visitation

overnight. There were some concerns with the unsupervised visits when K.C. returned with bug bites all over his legs, a cigarette burn, welts and scabies. In addition, therapy with an organization through the foster agency was also required to help the father improve his relationship and parenting skills as they worked towards reunification.

{¶ 13} Unsupervised visitation was suspended in June 2012 after K.C. told several people that his father pushed him to the floor and spanked him. The father denied this incident, but during questioning, admitted to the caseworker that he smacked K.C.'s legs while they were riding in the car. After this report, visitation was changed back to two-hour supervised visits once a week at the agency.

{¶ 14} The second agency caseworker testified that she took over the case in August 2012 when the previous caseworker was promoted within the agency. She indicated that at the time she received the case, the major issues were the chaotic nature of parenting time and a lack of bond with the child. She tried moving visits from the agency's visitation center to the foster mother's home with no progress. Based on her observations, the caseworker requested that the father complete a parenting assessment because K.C.'s behavior at visits was decompensating and it was affecting his behavior at school and home. She indicated that when she took over the case, based on time restrictions, the agency had to make a decision regarding whether to seek another time extension or to file for permanent custody. The caseworker stated that based on conversations with the Court Appointed Special Advocate (CASA), her supervisor, the foster mother and a psychotherapist, the agency decided to suspend visitations until after a parenting assessment was completed. She testified that although a request for an extension of time had been filed in the case, after discussion and input from others, the agency decided to withdraw the extension request and seek permanent custody.

{¶ 15} The psychotherapist who completed the parenting evaluation testified that a

parenting evaluation is an observation of parenting abilities and of the response and reaction between a parent and child. Based on her observations, the psychotherapist indicated concern that the father is minimizing his role in the abuse and neglect of K.C. by not accepting responsibility. She explained that it is difficult for a person to change his parenting unless he acknowledges his responsibility. She observed that K.C. is developmentally delayed, hyperactive and has speech and language issues. The psychotherapist concluded that the father has a bond with K.C., and cares about the child and his well-being, but she did not see that bond from K.C. to his father. The child responds to his father with anxiety, anger and oppositional behavior. She indicated K.C. is more neutral with his mother. Based on her assessment, the psychotherapist concluded that K.C. needs permanency as soon as possible. She indicated that the child has significant developmental, emotional and behavioral issues and an unstable environment would be devastating for his growth and development. She indicated that K.C. has a history of abuse and neglect which is traumatic and the child relives this trauma to some extent in his visitations with his father.

{¶ 16} A mental health therapist who completed a parenting evaluation in early 2013 at the request of the father testified that she performs assessments to look at the relationship and interactions between parents and children. The therapist indicated that she looks at the psychosocial and mental health functioning of the parties and at the ability of a parent to read what the child needs and to meet that need. She noted that the father is minimizing his involvement in the child's problems. The therapist concluded that K.C. does not want to be reunified with his father at this point. She stated that K.C. is content where he is and becomes agitated at the thought of reunification. Based on the assessment, the therapist concluded that reunification is not appropriate. After reviewing the report of the previous parenting assessment, the therapist indicated she agrees with the conclusions in that report.

{¶ 17} An agency case aide testified that it is her job to facilitate visitations and

- 6 -

supervise parenting time at the agency visitation center. She indicated K.C. was hyperactive, would not listen and was all over the place. She indicated that in initial visits, the foster mother was present to control K.C.'s behavior because the parents were unable to do so. The foster mother was eased out of the visits so that the parents could take a larger role in parenting the child. The case aide testified that the parents "did ok" on their own for a while. While the father had unsupervised visitation, the mother visited alone and things were going well. However, when supervised visits with the father were returned to the agency visitation center in July 2012, the case aide noticed that the situation had drastically changed and K.C.'s behavior with his parents had "gone downhill." The case aide testified that K.C. was angry, defiant, aggressive and argumentative. She indicated at the end of these visits, K.C. separated from his parents easily and ran to his foster mother.

{¶ 18} A therapist testified that she works for the foster care agency and does therapy for foster children and their families. She indicated that therapy is typical when reunification is intended and the goal of the therapy program is to increase interaction between the parent and child. She testified that the goal with K.C. and his father was for the child to listen to direction from his father and for K.C. to decrease inappropriate and antisocial behavior, such as spitting and hitting. She also indicated the therapy was to help the father process past visits outside of therapy and to talk about different ways to help K.C. cope and to provide actual interaction in a therapeutic way. She indicated the father was able to understand what was discussed and was able to use some redirection with K.C., but was unable to use other tools to parent. She indicated K.C. has obstacles and needs someone with a lot of patience and different tools to be able to parent him appropriately. She indicated K.C. was diagnosed with a disturbance disorder which involves defiant behavior where he screams, punches, hits and spits.

{¶ 19} The therapist indicated she observed the father try to redirect K.C.'s behavior,

but when it did not work, the behavior would escalate and the father would continue with redirection and the therapist would have to step in and help deescalate the situation. With regard to the bond between the father and K.C., the therapist saw some inconsistency, but indicated that more consistently she observed increased destructive and defiant behavior over the course of the sessions. Although the goal was to help increase the interaction, she instead observed an increase in the difficulty within the interaction, indicating that there was actually a regression in the nine months she worked with the father and son. Over this time she saw no increase in the father's ability to implement the parenting tools he had learned. Overall, though, she indicated she saw improvement in K.C.'s behavior with regards to interactions with her, and with the office staff at the same time while the child's relationship with his father was deteriorating.

{¶ 20} K.C.'s mother testified that it was not abnormal for the father to hit the child and the grandmother warned her not to say certain things when children services came to the house. She stated she did not believe K.C. should go with his father because of the father's anger issues and described the father's discipline as excessive at times. The mother's fiancé also testified on behalf of the mother. The mother's counselors testified regarding her mental health.

{¶ 21} The father testified that he had been sentenced twice for child endangering. He indicated that as part of a plea bargain, he pled to both charges at the same time. He testified that visitations went reasonably well and that he was able to have the child on overnights. He indicated that when visitations resumed at the agency, K.C. was more misbehaved than previously. The father testified that he wanted to engage in another form of therapy, Parent Child Intervention Therapy (PCIT), with K.C. and told both caseworkers. The father testified that he thinks PCIT is necessary to restore the bond between him and his son, who has been out of the house for two years. He indicated that they need more

specialization than the basic parenting class.

{¶ 22} The foster mother testified that K.C.'s behavior has improved greatly. She indicated he is doing well in school and is on medication for ADHD. She testified that the child thrives in a structured environment and is progressing. She indicated that his behavior at visits is very different and that he would come back from visits upset and just wanted to go to bed, which was unusual. She described an incident in which K.C. returned from a visit agitated and crying and stated that his father had knocked him to the floor. The foster mother also indicated that K.C. refers to his father by his first name.

{¶ 23} The grandmother testified and agreed that the home was dirty at the start of the case, but the condition has improved. She indicated that she had no concerns regarding the father's ability to take care of the child. However, she stated that she was willing to step in and raise K.C. if the father was not found fit. K.C.'s aunt and great-grandmother also testified and discussed the parents, grandmother and their relationships with the child.

{¶ 24} The CASA testified at the hearing and discussed her interviews and observations on the case. She indicated that she found an alarming amount of evidence from the people she interviewed regarding the abuse and neglect. She indicated the father did well with the case plan, but did not implement what he learned and his pattern of behavior is still exactly the same. The CASA indicated that she never developed a level of comfort that K.C would be safe if he went home. She also described the visits she observed and that K.C. was often uncontrollable and his foster mother was the only one who could redirect him. The CASA testified that she noticed some improvement during the case, but with extended visits and unsupervised visits she noticed a downswing in K.C.'s behavior.

{¶ 25} The CASA described her observation that K.C.'s behavior in school and at the foster mother's home is completely different from the child's behavior at visits with his parents. She indicated K.C. needs a structured environment. She further testified the father

has anger issues and she does not believe the child is bonded to him. The CASA concluded that it is not in K.C.'s best interest to be reunited with his father, mother or with his grandmother. She testified that K.C. is not able to really comprehend the question of his wishes regarding custody, but she indicated he is a happier child when not in the presence of his family.

{¶ 26} The trial court issued a decision on November 6, 2013, denying the grandmother's motion for legal custody and granting the agency's motion for permanent custody of the child.

{¶ 27} The father now appeals the trial court's decision to grant permanent custody and raises two assignments of error for our review. First, he argues that the trial court erred in granting the state's motion for permanent custody. Second, he argues that in the alternative, legal custody should have been granted to the grandmother. The grandmother raises two assignments of error in her appeal, arguing that the trial court's decision to deny her motion for legal custody was against the manifest weight of the evidence and that there was insufficient evidence to support the trial court's decision.

{¶ 28} Before a natural parent's constitutionally protected liberty interest in the care and custody of his child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re Starkey,* 150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16 (7th Dist.). A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *In re Rodgers* (2000), 138 Ohio App.3d 510, 520 (12th Dist.).

- 10 -

{¶ 29} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.,* 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 22.

{¶ 30} The juvenile court found by clear and convincing evidence, and the father does not dispute, that K.C. has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period as of the date the agency filed the permanent custody motion. However, the father does dispute the juvenile court's finding that granting permanent custody of the children to the agency is in the child/children's best interest.

{¶ 31} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or

more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 32} In addition, the juvenile court considered the factors in R.C. 2151.414(E) for determining whether a child can be placed with either parent within a reasonable time. In its review of these factors, the court considered the mental health concerns of the parents, the neglect and abuse allegations after the child was placed in agency custody, the parents' failure to pay child support, the father's convictions for child endangering, and the likelihood that abuse or neglect will reoccur.

{¶ 33} As an appellate court reviewing a decision granting permanent custody, this court can neither weigh the evidence nor assess the credibility of the witnesses, but instead must determine whether there is sufficient clear and convincing evidence to support the juvenile court's decision. See *In re Dunn,* Tuscarawas App. No. 2008AP030018, 2008-Ohio-3785.

{¶ 34} In addition, issues of credibility are for the trier of fact, not the appellate court, to determine. *In re G.N.,* 170 Ohio App.3d 7, 2007-Ohio-126, ¶ 24 (12th Dist.). It is well-established that the juvenile court had the opportunity to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the testimony. *In re B.J.,* 12th Dist. Butler No. CA2011-10-192, 2012-Ohio-3127, ¶ 20.

{¶ 35} We have carefully reviewed the record in this case and the juvenile court's findings and find no error in the court's determination that permanent custody was in K.C.'s best interest. The trial court considered each of the factors in a thorough and comprehensive

decision and made findings that are supported by the record.

{¶ 36} On appeal the father specifically argues that the trial court erred by determining that K.C. could not be placed with him within a reasonable time. He contends that he remedied the problems that led to removal and that he did all that was asked of him by the agency. He further argues that he expressed a desire to do the PCIT program and although it was added to the case plan in August 2012, the agency did not give him time to complete this requirement and instead filed a motion for permanent custody. The father also argues that the trial court used inappropriate factors to reach its decision when it relied on the potential for future problems and possibility of future removal and not the current facts of the case.

{¶ 37} The trial court found that the father completed many of the services offered to him and fulfilled many of his duties under the case plan, including parenting classes and completion of the mental health exam. The court indicated that as the father cooperated with the case plan, parenting time visits were increased and changed to short unsupervised visits, to longer unsupervised visits.

{¶ 38} The court found, however, it did not appear to the caseworkers or CASA that the father had internalized or utilized the parenting techniques he was taught. The court indicated that observers to the visits indicated that the father becomes frustrated when K.C. blatantly disobeys or confronts him and the father continued to use intimidation and some bullying behavior in attempting to control the child. The court further noted that the father testified contrarily that he used patience, praise and gentle redirection when dealing with K.C.

{¶ 39} The trial court found that there were problems in the interaction and bond between K.C. and his father. The court found that the most anger and aggressive acting out in visits was directed at the father and the child would usually not accept any direction from the father at all. The court noted the changes and attempts of the agency to help visitation

go more smoothly and to increase the father's involvement, including ending the foster mother's involvement at visitation, changing the location of the visits, and unsupervised visits. The court indicated there was some minor improvement, but the father and grandmother felt the change and improvement was dramatic and the child should come home. The court further noted the concerning signs displayed by the child on returning from unsupervised visits, including physical and behavior problems.

{¶ 40} The court found that the father began to feel that PCIT would be beneficial and sought out information. The court found that PCIT would require three joint sessions between the father and K.C. a week, but around the time PCIT was discussed, a recent evaluation recommended against face-to-face contact between K.C. and his father. The court also found that K.C. has been in foster care for a long time and the professional evaluations in this case recommend permanency as soon as possible and that instability would be devastating for the child.

{¶ 41} We find no merit to the father's arguments on appeal. Although the PCIT program was discussed and even added to the case plan, at the same time, problems between K.C. and his father were increasing and a parenting evaluation was requested. The agency caseworker testified that because the evaluation recommended no face-to-face contact and PCIT required personal interaction three times a week, the parenting program was not an appropriate option. In addition, there was evidence that the father failed to successfully implement the parenting techniques he had learned in parenting classes and through the family therapy program.

{¶ 42} The court also appropriately considered the father's failure to obtain a driver's license and to obtain employment, his convictions for child endangering and his failure to display necessary parenting skills despite parenting classes and family therapy in determining whether the father will be able to parent K.C. within a reasonable time. The

father's first assignment of error is overruled.

{¶ 43} The father's second assignment of error and the grandmother's two assignments of error all relate to the trial court's decision not to grant legal custody to the grandmother. Both appellants argue that the grandmother was an appropriate placement for the child.

{¶ 44} When determining legal custody pursuant to an action involving an abused, neglected or dependent child, the paramount concern is the best interest of the child and the court should consider the totality of the circumstances affecting the best interest of the child. *In re M.A.,* 12th Dist. Butler No. CA2011-02-030, 2012-Ohio-545, ¶ 16.

{¶ 45} The court considered the statutory factors as they related to the grandmother and determined that it was not in K.C.'s best interest to be placed with his grandmother. The court found that the grandmother allowed her home to become filthy while K.C. lived there and that although it was cleaned now and appropriate, there was a history in the case of the home being cleaned up, then reverting to some of the previous unsanitary conditions. The court also found that the grandmother's devotion to her son, K.C.'s father, clouds her judgment. The court found that it was likely the grandmother would allow contact over time as the grandmother believes the father does not pose any risk to the child and that the grandmother may cover up any incidents that may occur. The court concluded that the grandmother does not appear to have the resolve or capacity to protect the child.

{¶ 46} The court also determined that K.C. does not want to be reunited with his family, including the grandmother. The court stated that forcing a custodial relationship with the grandmother would likely cause further aggression, acting out anger and rage. In addition, the court found that the grandmother had not put forward a viable plan for taking custody of K.C. and caring for him while working extended hours and managing his behavior. The court also considered the fact that the child's attorney and the CASA strongly

recommend that the grandmother not have custody of the child.

{¶ 47} On review of the record, we find the trial court's determinations are supported by the evidence. While the father and grandmother's evidence and testimony conflicts with that of other witnesses, as previously stated, issues of credibility are for the trial court, and not this court, to resolve. *In re B.J.,* 12th Dist. Butler No. CA2011-10-192, 2012-Ohio-3127, ¶ 20. Accordingly, we find the trial court did not err in denying the grandmother's motion for legal custody. The father's second assignment of error and the grandmother's first and second assignments of error are therefore overruled.

{¶ 48} Judgment affirmed.

S. POWELL and PIPER, JJ., concur.